Good afternoon, Your Honors. My name is Joseph Farzam, and I'm here on behalf of the appellants. Here with me today is Mr. David Brill on behalf of the Amicus American Association of Justice. And I'd like to reserve about six minutes for my rebuttal and about six minutes for Mr. Brill to discuss some policy issues, if I may. So what we're going to have is saving out 12 minutes. So you want to talk for eight at this time? Yes, Your Honor. Okay. You keep track of the time. This clock counts downward, so when you get to 12, that's about where you want to stop. We'll try to help you, but you keep track of your time. Will do, Your Honor. Thank you. Now, in 1790, more than two centuries ago, Congress enacted the Siemens Wage Act, giving the courts mandatory jurisdiction over Siemens wage claims. More than a century later, consistent with that same policy, Congress enacted the Federal Arbitration Act, specifically excluding Siemens employment contracts from arbitration. These two statutes of Congress serve as statutory obstacles to criminal arbitration. Now, the Federal Arbitration Act consists of three chapters. Title IX. Within Title IX, there is only one section where definitions are provided. It defines in Section 1 what is commerce and what isn't commerce. And in doing so, it excludes Siemens employment contracts. Now, this may be an important definitional matter. I understand that Section 1 defines commerce, and I understand that Section 1 excludes from the operation of the section Siemens contracts. But I'm not sure that its method of exclusion is to say that Siemens contracts don't involve commerce. As I read that statute, it excludes them by saying, well, Siemens railroad workers in commerce nonetheless aren't covered. Am I reading that incorrectly? That's correct, Judge Fletcher. Either way it's read, it has the same definition. In other words, Congress intended, when it defined what commerce is, not to include contracts for employment of transportation workers, including Siemens. That is very clear. Right there at the end, excluded. Yes, Your Honor. And nowhere in Title IX or anywhere does Congress define or provide any other definition for commerce. This is the only place in Section 1 where commerce is defined, and there are exceptions to that made. And in the history of the Federal Arbitration Act, Congress never provided any different definition for what is commerce. Now, the heading of Section 1 states clearly that commerce defined exceptions to operation of title, saying that this definition applies to the whole title, not just Chapter 1. Also in reading Section 1, Section 1 discusses transactions that are domestic, the subject of Chapter 1, and it discusses transactions that are foreign, the subjects of Chapters 2 and 3. If Congress intended for Section 1 not to apply to Chapters 2 and 3, then there would be no need for the word foreign in Section 1. Now, Section 2 is to say the convention. That comes later, right? Chapter 2, Your Honor. Yes. That comes later, correct? That comes in 1970. That's correct, Your Honor. And it says what with respect to Part 1 or Chapter 1? When Congress adopted the convention in 1970, it did so subject to a very specific reservation, that the convention would only apply to transactions that are commercial. Now, Congress, in saying that, didn't define or redefine what's commercial or commerce, because it had already provided a definition for commerce in Section 1. Looking at Chapter 2 where the convention, Section 202 refers back to Section 2 within Chapter 1 for the type of transactions that fall under the convention. Now, if Congress wanted to read Chapter 2 out of Title 9, or for Title 9 not to be read as one body of law, it wouldn't refer back to Section 2. The fact that it refers back to Section 2 shows that. Yes, but it doesn't refer back to Section 1. It doesn't refer back to Section 1. But when it refers back to Section 2, when the reading of Section 2 says transactions in commerce, and right preceding that on the same page in Section 1, it defines commerce. Yeah, but then I want to come back to my first question. And you may not wish to agree with what I said. As I read the exception for seamen and railroad workers, it's not an exception that is premised on their not being involved in commerce. It is an exception, as I read it, that says even though they are involved in commerce, nonetheless, the Arbitration Act doesn't apply. Well, Your Honor, there is no question that transportation workers, by the very nature of what they do, are involved in commerce. But Congress wants to, by this exclusion, make it clear that when we are talking about commercial transactions, we don't mean these contracts for employment of seamen and railroad workers, and hence the question. But if they intended to exclude them from the Convention, why are they only referring to Section 2, which is a definition of commerce? Your Honor, Congress, when it said that they will adopt the Convention subject to this reservation, that it would only apply to commercial transaction. And commercial meaning is an odd definition of commercial. It doesn't mean two sort of commercial parties. It means contracts in commerce. Yes, Your Honor. But Congress has never provided any other definition for what's commercial or what is commerce. It has provided one definition in Title IX. And in that definition, it excludes the transportation workers' contracts as well as ---- But you're so far not responding to my point, at least as I see it. I don't see the exclusion of seamen and railroad workers as an exclusion because they are not involved in commerce. I see it as an exclusion that says even though they are involved in commerce, they're nonetheless excluded. But the Convention says we cover everything in commerce. Yes, Your Honor. Well, but I think all your yeses so far are leading me to think, then, that seamen and railroad workers are in commerce. Seamen and railroad workers are in commerce, but not within the definition that Congress intended. They are in commerce in general if, you know, we look at the dictionary definition of what is commerce. They are included. But Congress took this reservation to expressly exclude seamen and other transportation workers from what commerce ---- how commerce ---- how Congress wanted to define commerce. And I understand that perfectly if all we're talking about is Chapter 1, the original Arbitration Act. My problem is once we get to the Convention, what does the Convention include or exclude? What does the Convention do with reference to Chapter 1? Well, Your Honor, Ambassador Kearney testified to the Congress when Congress wanted to adopt the Convention. And when it testified, it said to the Congress in its testimony that there is no need for Congress to redefine commerce because Section 1's definition of what's commerce is the national law definition of commerce. And if Congress would have disagreed with Ambassador Kearney, then Congress would have redefined when it adopted the Convention that by commerce and by commercial now we mean something different than we meant earlier. And now, Your Honor, what Royal Caribbean wants this Court to do is to take Chapter 2 out of the title and create a new definition of commerce and a new definition of what's commercial and apply it only to Chapter 2, completely ignoring Section 1 and the Congress's definition that was provided by Congress. And it actually doesn't make sense that Congress would want to adopt something different as to Chapter 2 as a definition of commerce, because that would give an unfair competitive advantage to a foreign flagship that does business in the U.S. over a U.S. flagship. A U.S. flagship here has to arbitrate or cannot arbitrate their claims with their seamen. But if your policy argument is that foreign-flagged ships have competitive advantage over American-flagged ships, that's true in spades and has been for a very long time. Your Honor, but the purpose of the Seamen's Wage Act was to avoid this type of unfair competitive advantage so that foreign seamen who are in the U.S. harbors, aboard foreign flagships, can come to the U.S. courts and bring their Wage Act claims to avoid this type of unfair competitive advantage. So foreign flagships who do business here in the U.S. by just simply flagging their ship in a foreign place can pay pennies and avoid paying wages to these crewmen while the U.S. flagships have to, according to the Seamen's Wage Act, provide their crewmembers with fair payment scheme of wages. Yeah. Well, the argument here is not the actual level of wage. The argument here is whether or not they can be sent to arbitration. Yes, Your Honor. And the whole purpose of Seamen's Wage Act was to avoid this unfair competitive advantage, and Congress wouldn't give this unfair competitive advantage by redefining what's commercial and what's commerce in adopting the Convention when it did so. Now, Congress's intent, when it adopted the Convention, to provide access to Seamen to come to U.S. courts is further evidenced by the fact that 13 years after its adoption of the Convention, Congress reenacted the Seamen's Wage Act. And in doing so, not only did Congress confirm that we want to give access to Seamen to bring their wage claims to court, Congress broadened that access to Seamen because the language before the 1983 reenactment said only a United States court shall have shall be available to Seamen for their claims. But in 1983, the language was broadened to say all courts, including the State courts, are now available for resolution of wage claims. And these two statutes serve as an impediment, as a statutory obstacle to compelling arbitration in this case. Well, you're down to nine. Why don't we hear from your co-counsel, and then you'll have some minutes to rebuttal yourself. Thank you, Justice. May it please the Court. Counsel. David Brill, appearing on behalf of the American Association for Justice. Your Honor, I'd like to address your two points, and then what I would submit to what is appropriate, which is, in respect, reframe this debate a bit. To address your first questions, Your Honor, one, the Seamen's exception is an exception, yes, to the what is otherwise commerce. But that exception is meant to apply, as my able counsel is trying to explain to the Court, to the Convention Act once implemented. It's the same definition from the FAA Chapter 1 to apply to Chapter 2. That was the fundamental point of Ambassador Kearney's testimony. There can be more. This would be an easier case for me if Kearney had written his testimony under the statute. But his testimony made clear he didn't need to, in his opinion. He stated, quote, there is no need for me to include the definition. Let me say it verbatim. And this is in the Senate Report 91-702 at 6, and it was included, and this is a critical element. This was included in the bills. And why is that critical? Because anything attached to the Senate bill is as if it was, in fact, Your Honor, included in the Senate language. It was not, of course, a question. Scalia. And you had a discussion about this with Mr. Justice Scalia? Well, Mr. Justice Scalia and I may beg to differ with each other, perhaps. But let's – then you know the quote, obviously, says it was not necessary to make any reference to the national law in the first sentence of 02-202 because the definition of commerce contained in Section 1 of the original Arbitration Act is the national law definition for the purposes of declarations. I would submit to Your Honor it's not a question of what really was intended. What was intended was clearly that this exception was to apply to the New York Convention, and I'll explain why momentarily. What really, though, was implicated below that was also, in all respect to the Eleventh Circuit, perversely applied in Lobo, on which the RCCL relies so heavily, understandably, is that the courts below and in Lobo failed to look at legislative intent in history. That's the real critical flaw in all of this. What did they look at instead? Ostensibly Circuit City v. Adams, which was a very rare and unusual exception to the mandate by even Justice Scalia and our current court in the United States to determine what is and isn't arbitrable. So in all respect, Your Honors, we know what Kearney meant. That cannot be seriously disputed. What was the problem below and in Lobo is they simply wrote it off. They said, forget about it, I'm throwing it away. Let me take your point and say that Kearney is right, and I'm going to read the statute that way. Here's what he says. It's not necessary to make reference to the national law of the United States in the first sentence of Section 202 because the definition of commerce contained in Section 1 of the original Arbitration Act is the national law definition for purposes of the Declaration. But that comes back to the analytic point I started with with your co-counsel. It depends on, then, how we read that exception for seamen and railroad workers. Is it an exception despite the fact that they're engaged in commerce, or is it a statement that that is not commerce? It is a statement that it is commerce in the overall generic sense of things, but it is an exception to the national definition of commerce as applied under the Title IX. And here's where I say we know that for sure, Judge. It is in the same paragraphs. It's in the same – it says exceptions to title. And the reasons for that were very clear. They never intended – You see, but that's not what Kearney said. You're now adding to what he said. All he says is, listen, we have the definition of commerce there. And he doesn't say, and the definition of commerce and the exclusion of seamen and railroad workers is incorporated into the Convention. Fair. But what was his intent? Well, that's my question. I mean, it's unclear to me. Mr. Brill, Mr. Brill, I have a question for you. Yes, sir, Your Honor. Can we go your way without splitting from the Fifth and Eleventh Circuits? I don't, frankly, see how. I think at the end of the day, we have to, as I said earlier, reframe this debate. What makes the Fifth and Eleventh's decision so disconfitting, so truly – I mean, I'm just going to say it. It's so truly unjust that it – we're talking about a wage act that was around before electricity. That was when Pasadena was part of Spain, for crying out loud. We're talking about when the Bill of Rights hadn't yet come into effect. That is the original wage act that has persisted all along, along this timeline. We get to 1958, when under the auspices of trying to create a model for large commercial transactions to be allowed to be arbitrated, so that when you and I are negotiating across the table a massive employment – a massive commercial contract, and I say to you, I'll sell you those cogs for 5 cents cheaper, but let's take away the expense of litigation in the United States court, that that was the whole genesis behind both the FAA and the New York Convention. It doesn't come into effect until 1970. And then from 1970 to 2000, we see not a blip, not a mention of anyone even thinking that that Convention Act could possibly apply to Siemens cases. And why? Because we go right back to what Mr. Farzian mentioned before. It has no way to really be beholden to U.S. legislative policy, because there can be no greater expression of U.S. policy than the fact that the Wage Act, to remain viable, has to preclude the application of an arbitration contract and an adhesive employment contract from doing away with it. If we take this point to its natural, logical conclusion, Your Honor mentioned early on to Mr. Farzian, well, hasn't the U.S. Merchant Marine Fleet been on a demise since forever? I did not say that. I thought that was what you implicated.  I said they are at a competitive disadvantage because of the enormous advantage given to American Siemens by very clear provisions of American law. Demise, I am not saying. In fact, if you really want to get into it, they are heavily subsidized, so there will be no demise. They are heavily subsidized, so there will be no demise. So please don't tell me that I talked about the demise of the American shipping industry. I misunderstood what you meant, Judge. I thought you meant that you said we're seeing a demise of the U.S. crew. I thought that's what you meant. And what I'm simply indicating, Judge, whether we agree to disagree on how much they're being on, let's say, liquid gas petroleum tankers, for example, these days, that's different than saying your crew that are working the underbellies of these vessels are not being excluded away by adhesive employment contracts that have arbitration clauses. And I simply suggest to the Court, unlike the Fifth and Eleventh, that if we pay homage at all, any kind of respect to legislative intent and policy, there is no way that we can come to the conclusion legitimately that allowing an arbitration clause in an arbitration contract like that could undo the Wage Act, the Jones Act, all of these things, especially as Mr. Farza mentioned. The Wage Act was amended not just once, but twice after the 1970 implementation of the Convention Act. And nowhere in there would they have done that if the whole point of it, it could be written away by arbitration. What would be the point of keeping the Wage Act, then? There would be no shipper that won't put an arbitration contract in there to avoid the possibility of the penalties. And what I'm simply urging the Court is to recognize what really is at stake. Not that I'm, of course, you don't understand, but I just want to emphasize it. We are talking a merchant marine, and in this day and age, it can't be any more important than it was when it first happened in 1790. Do we really think that our forefathers, when there was no electricity, there were only 13 colonies, really gave a damn and all respect to foreign seafarers for foreign seafarers' sake? No, they cared because if you didn't put them on level footing with an American seafarer, you can write off the American seafarer. And how important are they? Well, do you know they had the highest ratio of war dead in World War II? Even higher than the U.S. Marines themselves. They provided 95 percent of our war supplies to our soldiers in Vietnam. They continue to make provision of those supplies in this Iraq war and the previous one. And what we're saying here is, to heck with the merchant marine. We're going to allow these shippers. And this is great. It's a cruise line today. But it's the same Jones Act. It's the same wage act that is applied for every shipper. So if you say it's okay for a cruise line, you're not just saying we're not letting that foreign seafarer. Okay. We're deep into policy. We have strayed from the statute, and you've used up all your time. On the other hand, I will make a gift to your co-counsel and to the degree you wanted of several minutes in rebuttal. I appreciate that. Thank you for your time. May it please the Court. My name is Sanford Borer, and I'm here on behalf of the Appalese. I'm going to try to stick to the record here. We could all make policy arguments that aren't even in the briefs, but I can't do that. As long as we're talking policy, how much money are these guys making? Your Honor, I can't tell you that. Or as long as we're not making policy arguments, how much money are these people making? Your Honor, I can tell you that, but it's not in the record. I'd like to know. Okay. There's a little bit in the record. Maybe you might be able to supplement it. Yeah. Okay. The people here operate on tips. The hotel departments of the what they call the hotel departments on all the cruise lines are organized into different groups. So the people in the galley don't get tips because they don't interact with the public. The people who take care of the rooms get tips. The people who are waiters and assistant waiters, they get tips. These are tipped employees. They get a very small amount of money that they get no matter what their tips are a month, $50. I'm sorry. $50 a month, did you just say? They get $50 regardless of what their tips are. Per how long a period, did you say? For a month. $50 a month. Okay. Not yet including tips. Okay. They get a guarantee of a certain amount. So I don't know these numbers, but the guarantee will be $1,200, $1,500 a month. That's a guarantee if their tips somehow don't reach that level. Now, you've asked me the question, so the answer is they make $2,000, $2,500 a month. They don't pay taxes on that money, and they don't pay for their obviously for staying on the vessel. I'm not sure. They don't pay taxes in the United States on that money. Right. Most of these don't pay taxes in their home countries either. Okay. And their argument is, at least if this were ever to get to litigation or, I guess, to arbitration, their argument is somehow they're not getting their fair share of tips. That's their underlying argument, right? My understanding of the argument from the complaint is that, again, there's a wage scale that's attached to the collective bargaining agreement. I believe that is in the record. It provides for certain amounts of money at certain levels of employment, certain numbers of hours. There comes a time these people work seven days a week on the vessels. When they get over 70 hours in a week, they have to get an additional extra overtime, it's called, on top of everything else. I believe the claim below was that these people and a class of people they seek to represent do not get paid the extra overtime to which they're entitled because of a variety of circumstances that are attributable to my client. One would be my client not letting people write down additional time, my client telling people they don't clock in but to record your presence later, things like that. That would all be unlawful. All of that would be unlawful. Yeah, I'm sorry. I interrupted you and took you outside the record on where you intended to go. Thank you. Have I answered the question as best I could for you? Yeah. Please go ahead. I'm sorry. The issue here, however, is not whether, as I think both counsel for the appellant said, whether they're going to have their substantive rights or not, whether they can assert their statutory rights under the Jones Act or not. That's not the issue. And, in fact, I believe it was in Circuit City at the very end of the decision, the United States Supreme Court in Circuit City, which, of course, is cited in our brief. At the very end of the decision, the court said, you know, there's no loss of substantive rights. You do lose the right to one form in favor of another one. And the Supreme Court of the United States said that very thing in connection with discussing the Federal Arbitration Act and the difference between being able to arbitrate and sue. And in that case, it was an employment discrimination claim. And everybody, I think, in this country would say that that, too, like the Wage Act, is an important statutory right. Nonetheless, the Supreme Court in that case, again, under the Federal Arbitration Act, said that arbitration is okay. And in this case, these plaintiffs do not lose a single substantive claim by going into arbitration. Their Jones Act claim doesn't disappear, but they have to do it in arbitration. And where is this arbitration likely to take place? The arbitration for Ms. Carr, who's Turkey, Turkish, would be, it would be either in Turkey, where the ship is flagged. I'm trying to remember where the flag is, or in Miami. Now, it is, part of their argument, I think, goes to how unfair it would be for her to have to arbitrate in Turkey. But none of that's in the record. There's nothing in the record to indicate that would be unfair to a citizen of Turkey, such as Ms. Carr. These crews are international, and probably 100 countries are represented on any of the cruise line's vessels. Roberts. Is it her choice, if she wishes to arbitrate in Miami, she may do so under the contract? That, to be blunt, Your Honor, that would be my client's preference. I see. Again, I apologize if they object to it, but the Lobo case is going to be arbitrated and it's going to be arbitrated in Miami. Mr. Lobo is not from Miami. His lawyer is. And so, for all I know, Your Honor, we might agree to arbitrate in California because it's okay for us and that's where Mr. Farzan is. The location isn't my client's problem. It's whether there's arbitration or not. And I do understand someone might be in a particular country where they wouldn't want to arbitrate. But, again, that was the – I think the purpose of the collective bargaining agreement was not to force the employee to a forum that's foreign to the employee. I don't think we have in this claim an argument that this arbitration clause should not be enforced because of unconscionability or whatever. We're talking statutory arguments. They made the unconscionability argument. They haven't made it an oral argument, but they do. There's a couple of problems with that, but the basic one is there's nothing factually below to indicate there's any problem. And if you read the trial court's ruling, he goes through it. He says there's nothing in here to claim that there's unequal bargaining power. The Norwegian Seafarers Union, as it's now known, is an international union. It has thousands of members and represents thousands of seafarers internationally. There's no allegation that it's a kind of a sweetheart deal between the NSU, the Norwegian Seafarers Union, and my client. There is no argument that somehow my client has unequal bargaining power versus the union. My client's a big company, and it somehow forced something on the union. There's no argument that, and the district court knows a lot of these things, that these people didn't want to be bound by the collective bargaining agreement. You know, as we used to have in the right-to-work states in the United States where you could try to get out of it. They weren't claiming that they tried to negotiate their own deal. They weren't claiming that they objected to arbitration or anything like that. There simply was no factual predicate for a district court judge to determine that there's something unconscionable about this. And he did go through it, and he analyzed it, and that's where he came out. Now, the – there is language in some of the decisions on point. For example, Batista, where they just note in passing that it's the product of an arm's-length negotiation. But in this record, all we have is what appears to be a valid contract, a collective bargaining agreement, that was – appears to have been properly negotiated, and there was no contention based on fact that there was anything wrong with it at all. So the unconscionability becomes a problem. There's another argument they made on unconscionability, which is that the CFERs signed an agreement, which we call a sign-on agreement, and the sign-on agreement adopts the collective bargaining agreement, a copy of which is provided to the CFERs. Again, there's no factual arguments here that the CFERs never saw the agreement, didn't ask for it, but couldn't get it, or that there was something else wrong here. That also was noted in the Batista case. And while I'm mentioning Batista, I should say we don't just rely on Lobo. Lobo followed Batista. Batista has a very exhaustive discussion of the legislative history. And basically what you have is all of the plaintiff's side people who have argued this have Kearney and no other legislative history. And all of them tend to ignore the fact that the beliefs of the chairman of the committee saying this is what we think it means. And that's especially true here where someone like Kearney didn't actually talk about the CFERs exemption at all. That wasn't his purpose. He was talking about what's commerce and what's commercial. On the unconscionability thing, though, Your Honor, that's pretty much how they went at that, and the Court had nothing to work with for an argument that potentially or hypothetically could be made. You've heard a lot of hypotheticals today and suggestions and speculation about history, legislative history, intentions. I'd like to put a little of that in context. The Federal Arbitration Act was passed first. When the Convention Act was passed, implementing your convention, Congress could have said we're going to have coextensive definitions. They could have said it separately in Section 202, or they could have some other way said that. They could have implemented the New York Convention and the Convention Act by adopting everything in the FAA, the Federal Arbitration Act, but they did not. They didn't even use the exact same words. They did it as you said. They said everything in commerce, in the Federal Arbitration Act, that everything in commerce is this except these transportation, including CFERs employment agreements. But in the Convention Act, they didn't do that. All they said was it's everything that's in commerce at least. By way of example, it includes. They didn't say anything. I think we all know that Congress, if they wanted to, if it wanted to, could have said exactly what they're saying, that you can only file suit, you can't arbitrate, and the suit has to be in a Federal or State court, and we know that's not what happened. I think that the statute as written really couldn't be more obvious at this point. We, I don't believe, should be in the business of writing for Congress what some lawyers think today Congressmen in 1968 or 69 when there's no indication that that's what Congressmen. I think one of the lessons from the Circuit City case is that the Federal Arbitration Act says what it says. And I think that given the same opportunity, the court would say that the Convention Act says what it says. Then when you look at some other decisions and how the courts have looked at these particular acts, you see that in short, the court went out of its way to talk about just how important this act is, what the public policy is in favor of this act. Because we've heard a lot about public policy, and it is true that historically CFERs have been referred to as wards of the court, even up to very, I would say, very recent decisions. There's no question about that. In Congress, when it passed the act and when it amended the act, it has always said that the courts will be available. It has never said that only the courts will be available or that all such actions have to be in court. And when it passed the Convention Act, because of the problem in an international agreement like this, and the courts have again referred to it as avoiding parochial interests, which could be CFERs. It could be a particular industry. It could be the steel industry. It could be another industry in our country and something else in another country. All of the courts, and it's not just the Fifth and the Eleventh, but it's the Third Circuit. I'll try to remember the name of that case before I sit down. But they've all said that we have to avoid giving in to parochial interests. When the Federal Arbitration Act was passed, if we're going to speculate, I think we can speculate that the seafaring industry and maybe transportation industry, they or the union people on their side, found a way to carve themselves out of the definition in that act. But nothing like that happened in the Convention Act, and there's a reason for it. The Convention Act's purpose is to get an internationally uniform approach. So even the defenses, according to the decisions, even the defenses are those that are internationally recognized and just any old defenses to a contract. They're trying to achieve a uniformity in a commercial relationship, which I think Congress has said and every court that's looked at it has said, this is a commercial relationship. They're trying to have uniformity in when it applies and what the affirmative defenses to enforcement are because it's considered to be important to this country as part of the international community.  You see it in Shirk. You see how in Batista the court carefully considered what it saw as a legislative history. That'd be a 396 F. 2nd, 1297 to 1299. Was that F. 3rd by now? Whatever that decision is. And with regard to Mr. Kearney, I think we've heard a what amounts to wishful thinking as to what he was really talking about. And, in fact, I think in Batista they talk about it. Mr. Kearney didn't even talk about the exemption. He was talking about a whole different issue, what's domestic, what's international and that issue. Mr. Kearney wasn't speaking for Congress and he wasn't doing the way back when legislative history was more important for lawyers when you'd go through and you'd look at the different sections and there would be information relating to the different sections. There's none of that here. And, in fact, there's no legislative history other than Kearney ever cited by any of the plaintiffs. I don't want to repeat what we've already argued and I think I've responded to what they have. But if there are any other questions from the Court, I'd like to take my time to address them now. Any questions from the bench? Judge Gould? No. Judge Newman? No. Thank you very much. Thank you. Now, I won't say that you've saved some time, but we've saved a little time for you. Would you like four minutes between the two of you? I really appreciate that, Your Honor. First, I want to say, for more than two centuries, these seamen have been treated as special wards of admiralty and given special protection by these courts. Compelling arbitration will do away with this protection forever. These seamen have no rights to come to American courts. In fact, the contract doesn't provide the option of coming to Miami for arbitration. The contract only provides that they arbitrate their claim, for example, in Ms. Carr's case in Turkey. And if there is no arbitration available then, then they will – they will – they can do it in Miami. The point is, though, Your Honor, that defense cited to Shirk. In Shirk, the Court, in its analysis, considered all the contacts with the United States. And in this case, the contacts are significant. The fact that these seamen fly to the United States to work for a U.S.-based company and the wage claims that they're complaining of happens in California. When they come to the ports of California at the end of their voyage, these wages are due to them when these few dollars is – they're cheated out of these few dollars and when they're not paid these wages, they have to go fly to Turkey and go and find an arbitrator there to arbitrate their claim, an arbitrator that's chosen only by the defense and the union. They're never going to do that. This arbitration clause is going to actually act as a class action waiver because no seaman is going to have the incentive to bring an individual claim for the few dollars that they're cheated out of. Now, is an arbitrator in Turkey going to know Seaman's Wage Act? Can they be relied upon to award penalties under the Seaman's Wage Act? If a shipowner is not paying wages to thousands and thousands of people, can an arbitrator in Turkey issue an injunctive – award an injunctive relief stopping the shipowner from their wrongful practice? Of course they can't do that. You know, they can't exercise in-run jurisdiction in Turkey over the ship, which is a sacred thing held by the seaman. No arbitrator in Turkey is going to be able to do that. Now, Your Honor, it's real interesting, speaking of policy issues, that only after arbitration clause in the seaman's contract. Why would the union do that? If the union is actually caring for the seafarers, the union wouldn't agree to put an arbitration clause right after Batista and, you know, which led to the Lobo decision. Now, I'd like to also save a couple of minutes for him.  Mr. Brell. Yes. Mr. Brell, you've got one minute and 25 seconds. Yes, sir. Your Honor, firstly, there is nothing else other than Kearney. Kearney, if you read our brief that we submitted, held three critical posts. He was the State Department official in charge of the entire 12-year delay of that convention implementation. He was the man. There is no better person or spokesperson for legislative intent. There's nothing else to which – he also was the head of the entire group that was affiliated, that presented that whole thing. Kearney was the guy. And in all respect to my opposing counsel, it wasn't that Batista or Stoddard or anyone looked at Kearney or legislative intent or history to support their position. They specifically refused to look at the legislative intent in history, but rather said under the Circuit of City v. Adams, there was no need. And my fundamental point, if I could leave you with that, is that if you look at legislative intent in history, there can be no greater expression of U.S. public policy than the Wage Act has to have a play here in the courts and cannot be just written away by an arbitration contract. What the basic problem here is, you only can get to where you get below is if you ignore legislative intent in history. And at the end of the day, I ask you to what end? In all respect to the defendant, this is the first time we're ever hearing about them wanting to be in Miami or having – they don't concede in trial courts below that the Jones Act or Wage Act persists. What we're talking about is basically you're talking about further bolstering an already bloated bottom line for a cruise ship industry that pays no taxes on their cruise earnings and are based right here in the U.S. competing with domestication – the domestication industry. Thank you, Your Honor.  Thank both sides for their argument. The case of Rogers v. Royal Caribbean Cruise Lines is now submitted for decision, and we are in adjournment until tomorrow morning. Thank you.
judges: Noonan, Fletcher, Gould